**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

|  |  |
|---|---|
| STEPHANIE CLARK, on behalf of herself and all others similarly situated,<br><br>     Plaintiff,<br><br>v.<br><br>PROGRESSIVE CASUALTY INSURANCE COMPANY**,**<br><br>     Defendant | Case No. _____<br><br><br><br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Stephanie Clark ("Plaintiff" or "Ms. Clark"), individually and on behalf of all others similarly situated, by and through her undersigned counsel, files this Class Action Complaint against Progressive Casualty Insurance Company ("Progressive" or "Defendant") and alleges the following based on personal knowledge of facts pertaining to her, on information and belief, and based on the investigation of counsel as to all other matters.

## NATURE OF THE ACTION

1.     Progressive is an insurance company based out of Mayfield Village, Ohio that provides a range of insurance products, including personal and commercial automobile insurance, motorcycle insurance, boat insurance, property insurance, and recreational vehicle insurance.

2.     This class action arises out of a recent cyberattack and data breach ("Data Breach"), which resulted in unauthorized actors viewing and accessing the personally identifiable information ("PII") of approximately 347,100 individuals.[1]

---

[1]     Data Breach Notification, Progressive Casualty Insurance Company, Me. Attorney Gen., https://apps.web.maine.gov/online/aeviewer/ME/40/7832b375-dedf-4be0-9437-1329b9c6a55b.shtml (last visited Aug. 15, 2023).

3.     On May 19, 2023, Progressive was notified that some of its third-party call center employees improperly shared their Progressive access credentials with unauthorized individuals who purportedly performed the employees' call center job duties.[2] These unauthorized individuals had access to the personal and confidential information of some of Progressive's customers.

4.     Instead of immediately notifying customers that their PII had been accessed by unauthorized individuals, Progressive waited almost three months. It was not until around August 1, 2023 that Progressive began notifying customers of the Data Breach.

5.     Worse yet, Progressive disclosed that the earliest date of employment of any of the potentially involved employees by the third-party service provider was May 2021.[3] Therefore, the Data Breach went unnoticed for years.

6.     Progressive's carelessness, negligence, and lack of oversight and supervision caused its customers to lose all sense of privacy. Plaintiff and members of the Class have suffered irreparable harm, including the exposure of their PII to nefarious strangers and their significantly increased risk of identity theft. The information at issue here is the very kind of information that allows identity thieves to construct false identities and invade all aspects of Plaintiff's and Class members' lives. In addition to facing the emotional devastation of having such personal information fall into the wrong hands, Plaintiff and Class members must now undertake additional security measures and precautions to minimize their risk of identity theft.

7.     Plaintiff's and the Class members' rights were disregarded by Progressive's negligent or reckless failure to take adequate and reasonable measures to ensure its data systems were secure and the PII entrusted to it would not be stolen. Progressive also failed to disclose the material fact that it did not have adequate information security controls to safeguard PII, failed to

---

[2] *See* Exhibit 1, Notice Letter (Aug. 1, 2023).
[3] *Id.*

supervise its third-party vendors, failed to take foreseeable steps to prevent the Data Breach, and failed to monitor and timely detect the Data Breach.

8.      As a result of the Data Breach, Plaintiff's and Class members' PII has been and will continue to be exposed to criminals for misuse.

9.      Plaintiff brings this action individually and on behalf of the Class, seeking remedies including, but not limited to, compensatory damages, reimbursement of out-of-pocket costs, injunctive relief, reasonable attorneys' fees and costs, and all other remedies this Court deems proper.

## PARTIES

*Plaintiff*

10.      Ms. Clark is, and at all times mentioned herein was, a citizen and resident of Jackson, Mississippi. Progressive provides bundled auto and home insurance coverage to Plaintiff.

11.      In August 2023, Plaintiff received a Notice Letter from Progressive informing her that her personal information, including her name, address, driver's license number, email address, phone number, and date of birth were compromised in the Data Breach.[4]

12.      Plaintiff's and Class members' PII was entrusted to Progressive for insurance purposes with the reasonable expectation and mutual understanding that Progressive would comply with its obligations to keep such information confidential and secure from unauthorized access, including thoroughly vetting all third parties it hired to ensure that they employed adequate data security measures, procedures, protocols, and practices.

---

[4] *Id.*

13.     Because of the Data Breach, Plaintiff's PII is now in the hands of criminals. Plaintiff and all Class members are now imminently at risk of crippling future identity theft and fraud.

14.     After receiving the Notice Letter, Plaintiff spent considerable time investigating the Data Breach. For instance, Plaintiff has spent time researching and verifying the legitimacy of the Data Breach upon receiving the Notice Letter and taking other steps in an attempt to mitigate the adverse consequences of the Data Breach. The Notice Letter Plaintiff received from Progressive specifically directed her to take these actions.[5]

15.     As a direct and proximate result of the Data Breach, Plaintiff will likely need to purchase a lifetime subscription for identity theft protection and credit monitoring.

16.     Plaintiff has been careful to protect and monitor her identity. Plaintiff has also suffered injury directly and proximately caused by the Data Breach, including: (a) theft of Plaintiff's valuable PII; (b) damages to and diminution in value of Plaintiff's PII that was entrusted to Progressive with the understanding that Progressive would safeguard this information against disclosure; (c) loss of the benefit of the bargain with Progressive to provide adequate and reasonable data security—*i.e.*, the difference in value between what Plaintiff should have received from Progressive and Progressive's defective and deficient performance of that obligation by failing to provide reasonable and adequate data security and failing to protect Plaintiff's PII; and (d) continued risk to Plaintiff's PII, which remains in the possession of Progressive and which is subject to further breaches, so long as Progressive fails to undertake appropriate and adequate measures to protect the PII that was entrusted to Progressive.

---

[5] *Id.*

*Defendant*

17.     Defendant Progressive Casualty Insurance Company is an Ohio corporation with its principal place of business located at 6300 Wilson Mills Road, Mayfield Village, Ohio 44143.

## JURISDICTION AND VENUE

18.     This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The amount in controversy exceeds $5 million, exclusive of interest and costs. At least one member of the Class, defined below, is a citizen of a different state than Defendant, and there are more than 100 putative Class members.

19.     This Court has personal jurisdiction over Defendant because its principal place of business is in this District, it regularly transacts business in this District, and upon information and belief, some Class members reside in this District.

20.     Venue is proper in this District under 28 U.S.C. § 1391(a)(1) because Defendant's principal place of business is located in this District and a substantial part of the events giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

*The Data Breach*

21.     On May 19, 2023, Progressive received written notification from its third-party call center regarding an incident involving its call center representatives.[6] Apparently, some of the third-party service provider's employees improperly shared their Progressive credentials with unauthorized individuals, who were then able to access the PII of certain Progressive customers.[7]

---

[6] *Id.*
[7] *Id.*

22.     Progressive reported that the earliest date of employment of any of the potentially involved employees by the third-party call center was May 2021.[8] Therefore, the Data Breach occurred for years before Progressive learned of it.

23.     Progressive did not inform its customers as to when the unauthorized access of their PII stopped or why it had failed to notice.

24.     According to disclosures made by Progressive to the Texas Attorney General, the compromised PII included sensitive information such as names, addresses, social security numbers, driver's license numbers, and financial information (account numbers, credit card numbers, and/or debit card numbers).[9]

25.     Approximately 347,100 Progressive customers had their PII compromised in the Data Breach.[10]

26.     Despite having known about the Data Breach since May 2023, notices were not sent to affected individuals until on or around August 1, 2023—almost three months after the fact.

27.     Progressive is responsible for allowing the Data Breach to occur because it failed to implement and maintain reasonable safeguards, failed to comply with industry-standard data security practices, as well as federal and state laws and regulations governing data security, and failed to supervise, monitor, and oversee all third parties it hired who had access to Plaintiff's and the Class members' PII.

---

[8] *Id.*
[9] *See Data Security Breach Reports*, Tex. Office of Attorney Gen., https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage (last visited Aug. 15, 2023) (Search for "Progressive").
[10] Data Breach Notification, Progressive Casualty Insurance Company, Me. Attorney Gen., https://apps.web.maine.gov/online/aeviewer/ME/40/7832b375-dedf-4be0-9437-1329b9c6a55b.shtml (last visited Aug. 15, 2023).

28.     During the Data Breach, Progressive failed to adequately monitor its information technology infrastructure and its third-party call center. Had Progressive done so, it would have prevented or mitigated the scope and impact of the Data Breach.

29.     Plaintiff and Class members provided their PII to Progressive with the reasonable expectation and mutual understanding that Progressive would comply with its obligations to keep such information confidential and secure from unauthorized access.

30.     Progressive's data security obligations were particularly important given the substantial increase in cyberattacks and data breaches in the healthcare and government contracting industries preceding the date of the Data Breach, as well as given the incredibly sensitive nature of PII that it retained in its servers.

31.     By obtaining, collecting, and using Plaintiff's and Class members' PII, Progressive assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiff's and Class members' PII from disclosure.

32.     Indeed, Plaintiff and the Class members paid Progressive for insurance services with the understanding that Progressive would employ adequate data security measures, practices, and protocols. Progressive did not do this, however. Instead, Progressive provided Plaintiff's and the Class members' PII to third parties with inadequate data security measures, procedures, and protocols. This increased Progressive's profits at the expense of Plaintiff and the Class.

33.     As a result of Progressive's failure to protect sensitive PII it was entrusted with, Plaintiff and Class members are at a significant risk of identity theft, financial fraud, and other identity-related fraud into the indefinite future. Plaintiff and Class members have also lost the inherent value of their PII. And Progressive has retained a monetary benefit it is not entitled to in equity or good conscience.

***Progressive Was on Notice of Data Breach Threats and the Inadequacy of Its Data Security***

34.     Progressive's data security obligations were especially important given the substantial increase in cyberattacks and data breaches in recent years. In 2022, there were 1,802 reported data breaches, affecting approximately 422 million individuals.[11]

35.     Progressive has experience with data security threats. In 2006, a Progressive employee wrongfully accessed confidential customer information, including names, social security numbers, dates of birth, and property addresses.[12]

36.     Progressive's lax data security practices were called into question again in 2015. This time, telematics devices offered by Progressive were reported to have "dozens of security flaws that could be exploited by hackers" that could result in consequences ranging from "data loss to life and limb."[13]

37.     Progressive should have been aware—and was aware—that it was at risk of an internal data breach that could expose the PII that it collected and maintained.

38.     Despite this, Progressive failed to take the necessary precautions required to safeguard Plaintiff's and Class members' PII from unauthorized access.

***Progressive Failed to Comply with Statutory and Regulatory Obligations***

39.     Federal and State governments have established security standards and issued recommendations to minimize data breaches and the resulting harm to individuals and financial institutions. The Federal Trade Commission ("FTC") has issued numerous guides for businesses

---

[11] *2022 Data Breach Report*, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/2023/01/ITRC_2022-Data-Breach-Report_Final-1.pdf, at 2 (last visited Aug. 15, 2023).

[12] Jaikumar Vijayan, *Data breach at Progressive highlights insider threat*, ComputerWorld (Apr. 6, 2006), https://www.computerworld.com/article/2562543/data-breach-at-progressive-highlights-insider-threat.html.

[13] Caitlin Bronson, *Progressive security holes put 2 million at risk*, Insurance Business (Jan. 19, 2015), https://www.insurancebusinessmag.com/us/news/breaking-news/progressive-security-holes-put-2-million-at-risk-21007.aspx.

that highlight the importance of reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.[14]

40.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which establishes guidelines for fundamental data security principles and practices for business.[15] Among other things, the guidelines note businesses should properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct security problems. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating that someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[16]

41.     Additionally, the FTC recommends that companies limit access to sensitive data, require complex passwords for network access, use industry-tested methods for security, monitor for suspicious activity on the network, and verify that third-party service providers have implemented reasonable security measures.[17]

42.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect PII, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C.

---

[14] *See Start With Security: A Guide for Business*, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205- startwithsecurity.pdf.
[15] *Protecting Personal Information: A Guide for Business*, FTC (Oct. 2016), https://www.ftc.gov/business-guidance/resources/protecting-personal-information-guide-business.
[16] *Id.*
[17] *See Start With Security: A for Business*, FTC, *supra* n.14.

§ 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[18]

43.     Progressive also failed to comply with commonly accepted industry standards for data security. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

- Maintaining a secure firewall configuration;

- Maintaining appropriate design, systems, and controls to limit user access to certain information as necessary;

- Monitoring for suspicious or irregular traffic to servers;

- Monitoring for suspicious credentials used to access servers;

- Monitoring for suspicious or irregular activity by known users;

- Monitoring for suspicious or unknown users;

- Monitoring for suspicious or irregular server requests;

- Monitoring for server requests for PII;

- Monitoring for server requests from VPNs; and

- Monitoring for server requests from Tor exit nodes.

44.     Progressive is also required by various states' laws and regulations to protect Plaintiff's and Class members' PII and to handle any breach of the same in accordance with applicable breach notification statutes.

45.     In addition to its obligations under federal and state laws, Progressive owed a duty to Plaintiff and Class members whose PII were entrusted to Progressive to exercise reasonable care

---

[18] *Privacy and Security Enforcement Press Releases*, FTC, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement (last visited Jan. 21, 2021).

in obtaining, retaining, securing, safeguarding, deleting, and protecting the PII in its possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons. Progressive owed a duty to Plaintiff and Class members to provide reasonable security, including consistency with industry standards and requirements, and to ensure that its systems and networks adequately protected the PII of Plaintiff and Class members.

46.     Progressive owed a duty to Plaintiff and Class members whose PII was entrusted to Progressive to design, maintain, and test its systems to ensure that the PII in Progressive's possession was adequately secured and protected.

47.     Progressive owed a duty to Plaintiff and Class members whose PII was entrusted to Progressive to create and implement reasonable data security practices and procedures to protect the PII in its possession.

48.     Progressive owed a duty to Plaintiff and Class members whose PII was entrusted to Progressive to implement processes that would detect a breach on its data security systems in a timely manner.

49.     Progressive owed a duty to Plaintiff and Class members whose PII was entrusted to Progressive to act upon data security warnings and alerts in a timely fashion.

50.     Progressive owed a duty to Plaintiff and Class members whose PII was entrusted to Progressive to disclose if its systems and data security practices were inadequate to safeguard individuals' PII from theft because such an inadequacy would be a material fact in the decision to entrust PII to Progressive.

51.     Progressive owed a duty to Plaintiff and Class members whose PII was entrusted to Progressive to disclose in a timely and accurate manner when data breaches occurred.

52.     Progressive owed a duty of care to Plaintiff and Class members because they were foreseeable and probable victims of any inadequacy in its affirmative development of the systems to maintain PII and in its affirmative maintenance of those systems.

53.     In this case, Progressive was fully aware of its obligation to use reasonable measures to protect the PII of its customers. Progressive also knew it was a target for hackers. But despite understanding the consequences of inadequate data security, Progressive failed to comply with industry-standard data security requirements.

***The Effect of the Data Breach on Impacted Consumers***

54.     The exponential cost to Plaintiff and Class members resulting from the Data Breach cannot be overstated. Criminals can use victims' PII to open new financial accounts, incur charges in credit, obtain governmental benefits and identifications, fabricate identities, and file fraudulent tax returns well before a person whose PII was stolen becomes aware of it.[19] Any one of these instances of identity theft can have devastating consequences for the victim, causing years of often irreversible damage to their credit scores, financial stability, and personal security.

55.     Defendant was or should have been aware that it was collecting highly valuable data, which has increasingly been the target of data breaches in recent years.

56.     The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other

---

[19] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/new.items/d07737.pdf; Melanie Lockert, *How do hackers use your information for identity theft?*, CREDITKARMA (Oct. 1, 2021), https://www.creditkarma.com/id-theft/i/how-hackers-use-your-information; Ravi Sen, *Here's how much your personal information is worth to cybercriminals – and what they do with it*, PBS (May 14, 2021), https://www.pbs.org/newshour/science/heres-how-much-your-personal-information-is-worth-to-cybercriminals-and-what-they-do-with-it; Alison Grace Johansen, *4 Lasting Effects of Identity Theft*, LIFELOCK BY NORTON (Feb. 4, 2021), https://lifelock.norton.com/learn/identity-theft-resources/lasting-effects-ofidentity-theft.

criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

57.     Plaintiff's and Class members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiff and Class members and to profit from their misfortune.

***Diminution of Value of PII***

58.     PII is valuable property.[20] Its value is axiomatic, considering the value of Big Data in corporate America and that the consequences of cyber thefts include heavy prison sentences. Even this obvious risk-to-reward analysis illustrates, beyond doubt, that PII has considerable market value.

59.     The PII stolen in the Data Breach is significantly more valuable than the loss of credit card information in a large retailer data breach. Victims affected by those retailer breaches could avoid much of the potential future harm by simply cancelling credit or debit cards and obtaining replacements.

60.     This type of data commands a much higher price on the dark web. As Martin Walter, senior director at cybersecurity firm RedSeal, explained: "Compared to credit card information, personally identifiable information … [is] worth more than 10x on the black market."[21]

---

[20] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737 (June 2007), https://www.gao.gov/new.items/d07737.pdf , at 2.
[21] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT WORLD (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.

61.     Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[22]

62.     An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[23] Indeed, a social security number, date of birth, and full name can sell for $60 to $80 on the digital black market.[24]

63.     As a result of the Data Breach, Plaintiff's and Class members' PII, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiff or Class members for their property, resulting in an economic loss. Moreover, the PII is now readily available, and the rarity of the data has been lost, thereby causing additional loss of value.

64.     The fraudulent activity resulting from the Data Breach may not come to light for years.

65.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

66.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to millions of individuals' detailed

---

[22] *See, e.g.,* John T. Soma, et al., *Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("Private Information") Equals the "Value" of Financial Assets,* 15 RICH. J.L. & TECH. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[23] David Lazarus, *Column: Shadowy data brokers make the most of their invisibility cloak,* L.A. TIMES (Nov. 5, 2019), https://www.latimes.com/business/story/2019-11-05/column-data-brokers.

[24] Michael Kan, *Here's How Much Your Identity Goes for on the Dark Web,* PCMAG (Nov. 15, 2017), https://www.pcmag.com/news/heres-how-much-your-identity-goes-for-on-the-dark-web.

PII and thus the significant number of individuals who would be harmed by the exposure of the unencrypted data.

67.     The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class members.

***Loss of Time to Mitigate the Risk of Identity Theft and Fraud***

68.     As a result of the recognized risk of identity theft, when a data breach occurs and an individual is notified by a company that their PII was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports could expose the individual to greater financial harm.

69.     Class members have spent, and will spend, time on a variety of prudent actions, such as researching and verifying the legitimacy of the Data Breach upon receiving their Notice Letters, and monitoring their credit reports for suspicious activity, as Progressive advised in its Notice Letters.[25]

70.     These mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches, in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[26]

---

[25] *See* Exhibit 1.
[26] *See Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, *supra* n.20.

71.     Plaintiff's mitigation efforts are also consistent with the steps the FTC recommends data breach victims take to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (and considering an extended fraud alert that lasts for seven years if someone steals their identity), reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[27]

72.     Plaintiff and Class members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiff and Class members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

73.     Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's network, amounting to millions of individuals' detailed PII and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

74.     The injuries to Plaintiff and Class members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the PII of Plaintiff and Class members.

***Impact of Identity Theft Can Have Ripple Effects***

75.     Reimbursing a consumer for a financial loss due to fraud does not make that individual whole again. On the contrary, in addition to the irreparable damage that may result from the theft of a social security number, identity theft victims must spend numerous hours and their own money repairing the impact to their credit. The Department of Justice's Bureau of Justice

---

[27] *See Identity Theft.gov*, FTC, https://www.identitytheft.gov/Steps (last visited Aug. 15, 2023).

Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.

76.    And, the impact of identity theft can have ripple effects, which can adversely affect the future financial trajectories of victims' lives. For example, the Identity Theft Resource Center reports that respondents to their surveys in 2013-2016 described that the identity theft they experienced affected their ability to get credit cards and obtain loans such as student loans or mortgages.[28] For some victims, this could mean the difference between going to college or not, becoming a homeowner or not, or having to take out a high-interest payday loan versus a lower-interest loan.

77.    It is no wonder then that identity theft exacts a severe emotional toll on its victims.

78.    The 2017 Identity Theft Resource Center survey[29] evidences the emotional suffering experienced by victims of identity theft:

- 75% of respondents reported feeling severely distressed;

- 67% reported anxiety;

- 66% reported feelings of fear for the financial safety of family members;

- 24% reported fear for their physical safety;

- 15.2% reported that a relationship ended or was severely and negatively impacted by the identity theft; and

- 7% reported feeling suicidal.

---

[28] *Identity Theft: The Aftermath 2017*, IDENTITY THEFT RES. CTR., https://www.idtheftcenter.org/wp-content/uploads/images/page-docs/Aftermath_2017.pdf (last visited Aug. 15, 2023).
[29] *Id.*

79.     Identity theft can also exact a physical toll on its victims. The same survey reported that respondents experienced physical symptoms stemming from their experience with identity theft:

- 48.3% of respondents reported sleep disturbances;

- 37.1% reported an inability to concentrate and/or lack of focus;

- 28.7% reported that they were unable to go to work because of physical symptoms;

- 23.1% reported new physical illnesses, including aches and pains, heart palpitations, sweating, and/or stomach issues; and

- 12.6% reported a start or relapse into unhealthy or addictive behaviors.[30]

80.     There may also be a significant time lag between when PII is stolen and when it is actually misused. According to the U.S. Government Accountability Office, which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[31]

81.     As the result of the Data Breach, Plaintiff and Class members have suffered and/or will suffer or continue to suffer economic loss, a substantial risk of future identity theft, and other actual harm for which they are entitled to damages, including, but not limited to, the following:

- Losing the inherent value of their PII;

- Losing the value of Defendant's implicit promises of adequate data security;

- Identity theft and fraud resulting from the theft of their PII;

---

[30] *Id.*

[31] *Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown*, GAO-07-737, *supra* n.20.

- Costs associated with the detection and prevention of identity theft and unauthorized use of their PII;

- Costs associated with purchasing credit monitoring and identity theft protection services;

- Unauthorized charges and loss of use of and access to their financial account funds and costs associated with inability to obtain money from their accounts or being limited in the amount of money they were permitted to obtain from their accounts, including missed payments on bills and loans, late charges and fees, and adverse effects on their credit;

- Lowered credit scores resulting from credit inquiries following fraudulent activities;

- Costs associated with time spent and the loss of productivity or the enjoyment of one's life from taking time to address and attempt to mitigate and address the actual and future consequences of the Data Breach, including discovering fraudulent charges, cancelling and reissuing cards, purchasing credit monitoring and identity theft protection services, imposing withdrawal and purchase limits on compromised accounts, and the stress, nuisance and annoyance of dealing with the repercussions of the Data Breach; and

- The continued imminent and certainly impending injury flowing from potential fraud and identify theft posed by their PII being in the possession of one or many unauthorized third parties.

82.     Additionally, Plaintiff and Class members place significant value in data security.

83.     Because of the value consumers place on data privacy and security, companies with robust data security practices can command higher prices than those who do not. Indeed, if consumers did not value their data security and privacy, companies like Defendant would have no reason to tout their data security efforts to their actual and potential customers.

84.     Consequently, had consumers known the truth about Defendant's data security practices—that Defendants would not adequately protect and store their data—they would not have entrusted their PII to Defendant, purchased insurance that included Defendant's services, or paid as much for such services or benefits.

85.     As such, Plaintiff and Class members did not receive the benefit of their bargain with the Defendant because they paid for a value of services they expected but did not receive.

## CLASS ACTION ALLEGATIONS

86.     Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

87.     Plaintiff brings this action on behalf of herself and the members of the proposed Class, which consists of:

> All individuals residing in the United States who received a Notice Letter from Progressive informing them that their information may have been compromised in the Data Breach.

88.     Excluded from the Class are Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, legal representatives, successors, subsidiaries, and assigns. Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and members of their immediate families and judicial staff.

89.     Plaintiff reserves the right to amend the above definition or to propose subclasses before the Court determines whether certification is appropriate.

90. The proposed Class meets the requirements of Fed. R. Civ. P. 23(a), (b)(2), and (b)(3).

91. Defendant has acted on grounds that apply generally to the Class making declaratory relief appropriate.

92. **Numerosity:** The proposed Class is so numerous that joinder of all members is impracticable. Defendant has reported that the total number of individuals affected in the Data Breach is 347,100.

93. **Typicality:** Plaintiff's claims are typical of the claims of the Class. Plaintiff and all members of the Class were injured through Defendant's uniform misconduct. The same event and conduct that gave rise to Plaintiff's claims are identical to those that give rise to the claims of every other Class member because Plaintiff and each member of the Class had their sensitive PII compromised in the same way by the same conduct of Defendant.

94. **Adequacy:** Plaintiff is an adequate representative of the Class because Plaintiff's interests do not conflict with the interests of the Class; Plaintiff has retained competent counsel who are experienced in prosecuting complex class action and data breach class action litigation; and Plaintiff and Plaintiff's counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and her counsel.

95. **Superiority:** A class action is superior to all other available methods for the fair and efficient adjudication of this lawsuit because individual litigation of the claims of all members of the Class is economically unfeasible and procedurally impracticable. The injury suffered by each individual member of the Class is relatively small in comparison to the burden and expense of individual prosecution of litigation. It would be very difficult for members of the Class to

effectively redress Defendant's wrongdoing. Further, individualized litigation presents a potential for inconsistent or contradictory judgments.

96.     **Commonality and Predominance:** There are numerous questions of law and fact common to the Class which predominate over any questions affecting only individual members of the Class.

97.     Among the questions of law and fact common to the Class are:

a.  Whether Defendant engaged in the wrongful conduct alleged herein;

b.  Whether Defendant failed to adequately safeguard Plaintiff's and the Class's PII;

c.  Whether Defendant failed to ensure the third-party vendor it hired had adequate data security, procedures, practices, and protocols;

d.  Whether Defendant negligently hired and/or failed to supervise the third-party vendor it hired and gave access to Plaintiff's and the Class's PII;

e.  Whether Defendant owed a duty to Plaintiff and the Class to adequately protect their PII, and whether it breached this duty;

f.  Whether Defendant breached its duties to Plaintiff and the Class as a result of the Data Breach;

g.  Whether Defendant's conduct, including its failure to act, resulted in or was the proximate cause of the breach;

h.  Whether Defendant was negligent in permitting the third-party access to Plaintiff's and the Class's PII;

i.  Whether Defendant was negligent in failing to adhere to reasonable retention policies, thereby greatly increasing the size of the Data Breach;

j.   Whether Defendant failed to adequately respond to the Data Breach, including failing to investigate it diligently and notify affected individuals in the most expedient time possible and without unreasonable delay, and whether this caused damages to Plaintiff and the Class;

k.   Whether Defendant continues to breach duties to Plaintiff and the Class;

l.   Whether Plaintiff and the Class suffered injury as a proximate result of Defendant's negligent actions or failures to act;

m.   Whether Plaintiff and the Class are entitled to recover damages, equitable relief, and other relief; and

n.   Whether Defendant's actions alleged herein constitute gross negligence, and whether Plaintiff and Class members are entitled to punitive damages.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### NEGLIGENCE
### (By Plaintiff and on Behalf of the Class)

98.   Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

99.   Defendant owed a duty of care to Plaintiff and Class members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems, as alleged herein. These common law duties existed because Plaintiff and Class members were the foreseeable and probable victims of any inadequate security practices in Defendant's affirmative development and maintenance of its data security systems and its hiring of third-party providers entrusted with accessing, storing, safeguarding, handling, collecting, and/or protecting Plaintiff's and Class

members' PII. In fact, not only was it foreseeable that Defendant and Class members would be harmed by the failure to protect their PII because hackers routinely attempt to steal such information and use it for nefarious purposes, Defendant knew that it was more likely than not that Plaintiff and other Class members would be harmed by such exposure and theft of their PII.

100.    Defendant's duties to use reasonable security measures also arose as a result of a special relationship with Plaintiff and Class members as a result of being entrusted with their PII, which provided an independent duty of care. Plaintiff's and Class members' willingness to entrust Defendant with their PII was predicated on the understanding that Defendant would take adequate security precautions. Moreover, Defendant was capable of protecting its network and systems, and the PII it stored on them, from unauthorized access.

101.    Defendant's duties to use reasonable data security measures also arose under Section 5 of the FTC Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Defendant's duties.

102.    Defendant breached the aforementioned duties when it failed to use security practices that would protect the PII provided to it by Plaintiff and Class members, thus resulting in unauthorized exposure and access to Plaintiff's and Class members' PII.

103.    Defendant further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit its processes, controls, policies, procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiff's and Class members' PII within its possession, custody, and control.

104. As a direct and proximate cause of Defendant's failure to use appropriate security practices and failure to select a third-party provider with adequate data security measures, Plaintiff's and Class members' PII was exposed, disseminated, and made available to unauthorized third parties.

105. Defendant admitted that Plaintiff's and Class members' PII was wrongfully disclosed as a result of the Data Breach.

106. The Data Breach caused direct and substantial damages to Plaintiff and Class members, as well as the likelihood of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud and identity theft.

107. By engaging in the foregoing acts and omissions, Defendant committed the common law tort of negligence. For all the reasons stated above, Defendant's conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately limit access to and protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiff's and Class members' PII.

108. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiff and Class members, their PII would not have been compromised.

109. Neither Plaintiff nor Class members contributed to the Data Breach or subsequent misuse of their PII as described in this Complaint.

110. As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual

identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendant, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE *PER SE***
**(By Plaintiff and on Behalf of the Class)**

111.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

112.    Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce" including, as interpreted and enforced by the FTC, the unfair act or practice by Defendant of failing to use reasonable measures to protect PII. Various FTC publications and orders also form the basis of Defendant's duty.

113.    Defendant violated Section 5 of the FTC Act (and similar state statutes) by failing to use reasonable measures to protect PII and not complying with industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of PII obtained and stored and the foreseeable consequences of a data breach.

114.    Defendant's violation of Section 5 of the FTC Act (and similar state statutes) constitutes negligence per se.

115.    Plaintiff and Class members are consumers within the class of persons Section 5 of the FTC Act (and similar state statutes) were intended to protect.

116.    Moreover, the harm that has occurred is the type of harm the FTC Act (and similar state statutes) was intended to guard against. Indeed, the FTC has pursued over fifty enforcement actions against businesses which, as a result of Defendant's failure to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm suffered by Plaintiff and Class members.

117.    As a direct and proximate result of Defendant's negligence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendant, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

**THIRD CAUSE OF ACTION**
**DECLARATORY JUDGMENT**
**(By Plaintiff and on Behalf of the Class)**

118.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

119. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., the Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Complaint.

120. An actual controversy has arisen in the wake of the Data Breach regarding Defendant's present and prospective common law and other duties to reasonably safeguard its users' PII, and whether Defendant is currently maintaining data security measures adequate to protect Plaintiff and Class members from further data breaches that compromise their PII. Plaintiff and Class members remain at imminent risk that further compromises of their PII will occur in the future.

121. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

    a. Defendant continues to owe a legal duty to secure users' PII under the common law, Section 5 of the FTC Act, and various state statutes; and

    b. Defendant continues to breach this legal duty by failing to employ reasonable measures to secure Plaintiff's and Class members' PII.

122. The Court also should issue corresponding prospective injunctive relief pursuant to 28 U.S.C. § 2202, requiring Defendant to employ adequate security practices consistent with law and industry standards to protect its users' PII.

123. If an injunction is not issued, Plaintiff and Class members will suffer irreparable injury, and lack an adequate legal remedy, in the event of another data breach of Defendant. The risk of another such breach is real, immediate, and substantial. If another breach occurs, Plaintiff and Class members will not have an adequate remedy at law because many of the resulting injuries

are not readily quantified and they will be forced to bring multiple lawsuits to rectify the same conduct.

124.    The hardship to Plaintiff and Class members if an injunction does not issue exceeds the hardship to Defendant if an injunction is issued. Among other things, if another data breach occurs at Progressive, Defendant and Class members will likely be subjected to fraud, identify theft, and other harms described herein. On the other hand, the cost to Defendant of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

125.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach at Progressive, thus eliminating additional injuries that would result to Plaintiff, Class members, and the hundreds of thousands of other individuals for whom Defendant stores and processes PII, and whose PII would be further compromised.

### FOURTH CAUSE OF ACTION
### BREACH OF CONFIDENCE
### (By Plaintiff and on Behalf of the Class)

126.    Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

127.    At all times during Plaintiff's and Class members' interactions with Defendant, Defendant was fully aware of the confidential and sensitive nature of Plaintiff's and Class members' PII.

128.    As alleged herein and above, Defendant's relationship with Plaintiff and Class members was governed by terms and expectations that Plaintiff's and Class members' PII would

be collected, stored, and protected in confidence, and would not be disclosed to the public or any unauthorized third parties.

129.     Plaintiff and Class members provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would protect and not permit their PII to be disseminated to the public or any unauthorized parties.

130.     Plaintiff and Class members also provided their respective PII to Defendant with the explicit and implicit understandings that Defendant would take precautions to protect the PII from unauthorized disclosure, such as following basic principles of encryption and information security practices.

131.     Defendant voluntarily received in confidence Plaintiff's and Class members' PII with the understanding that PII would not be disclosed or disseminated to the public or any unauthorized third parties.

132.     Due to Defendant's failure to prevent, detect, and avoid the Data Breach from occurring by following best information security practices and ensuring that its third-party providers followed best information security practices to secure Plaintiff's and Class members' PII, Plaintiff's and Class members' PII was disclosed and misappropriated to the public and unauthorized third parties beyond Plaintiff's and Class members' confidence, and without their express permission.

133.     But for Defendant's disclosure of Plaintiff's and Class members' PII in violation of the parties' understanding of confidence, their PII would not have been compromised, stolen, viewed, accessed, and/or used by unauthorized third parties. The Data Breach was the direct and legal cause of the theft of Plaintiff's and Class members' PII, as well as the resulting damages.

134.    The injury and harm Plaintiff and Class members suffered was the reasonably foreseeable result of Defendant's unauthorized disclosure of Plaintiff's and Class members' PII.

135.    Defendant knew its computer systems and technologies for accepting, securing, and storing Plaintiff's and Class members' PII had serious security vulnerabilities because Defendant failed to observe even basic information security practices or correct known security vulnerabilities.

136.    As a direct and proximate result of Defendant's breaches of confidence, Plaintiff and Class members have been injured and were damaged as discussed herein and as will be proven at trial.

137.    As a direct and proximate result of Defendant's breach of confidence, Plaintiff and Class members have been injured and are entitled to damages in an amount to be proven at trial. Such injuries include one or more of the following: ongoing, imminent, certainly impending threat of identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; actual identity theft crimes, fraud, and other misuse, resulting in monetary loss and economic harm; loss of the value of their privacy and the confidentiality of the stolen PII; illegal sale of the compromised PII on the black market; mitigation expenses and time spent on credit monitoring, identity theft insurance, and credit freezes and unfreezes; time spent in response to the Data Breach investigating the nature of the Data Breach not fully disclosed by Defendant, reviewing bank statements, payment card statements, and credit reports; expenses and time spent initiating fraud alerts; decreased credit scores and ratings; lost work time; lost value of the PII; lost benefit of their bargains and overcharges for services; and other economic and non-economic harm.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT
### (By Plaintiff and on Behalf of the Class)

138.   Plaintiff repeats and realleges each and every fact, matter, and allegation set forth above and incorporates them at this point by reference as though set forth in full.

139.   Through the use of Plaintiff and the Class members' PII, Defendant received monetary benefits.

140.   Defendant collected, maintained, and stored the PII of Plaintiff and Class members. As a result, Defendant had direct knowledge of the monetary benefits conferred upon it by Plaintiff and Class members.

141.   Defendant understood that a monetary benefit was being conferred upon it by Plaintiffs and the Class members and accepted that monetary benefit. Indeed, Plaintiff and the Class members paid for insurance with the understanding that Defendant would safeguard Plaintiff and the Class members' PII.

142.   Defendant's acceptance of that benefit under the facts and circumstances described herein makes it inequitable for Defendant to retain that benefit without payment of the value thereof. Specifically, Defendant enriched itself by saving the costs it reasonably should have expended on a third-party with adequate data security measures, procedures, and protocols to secure Plaintiff's and the Class members' PII. Instead of paying for a third party who provided a reasonable level of security that would have prevented the Data Breach, Defendant instead calculated to increase its own profits at the expense of Plaintiff and the Class members by using a cheaper third party with little to no data security measures in place. As a direct and proximate result of Defendant's choice to prioritize its own profits over data security, Plaintiff and the Class members suffered.

143.    Under the principle of equity and good conscience, Defendant should not be permitted to retain the monetary benefit belonging to Plaintiff and Class members because Defendant failed to ensure that any third party it hired implemented the appropriate data management and security measures.

144.    Defendant acquired the PII through inequitable means in that it failed to disclose the inadequate security practices of the third party it retained, who had access to Plaintiff's and the Class members' PII.

145.    If Plaintiff the Class members knew that Defendant had given their PII to a third party with inadequate data security measures in place, they would not have agreed to allow Defendant to have or maintain their PII.

146.    As a direct and proximate result of Defendant's decision to profit rather than hire a third party with adequate data security measures in place, Plaintiff and the Class members have suffered and will suffer actual damages, including (1) the amount of the savings and costs Defendant reasonably should have expended to provide a third party with adequate data security measures to secure Plaintiff's and the Class members' PII, (2) time and expenses mitigating harms, (3) the diminished value of the PII, (4) harms as a result of identify theft; and (5) an increased risk of future identity theft.

147.    Defendant, upon information and belief, has therefore engaged in opportunistic, unethical, and immoral conduct by profiting from conduct that it knew would create a significant and highly likely risk of substantial and certainly impending harm to Plaintiff and the Class in direct violation of Plaintiff's and the Class members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Defendant to retain the benefits it derived as a consequence of its wrongful conduct. Accordingly, Plaintiff and the Class are entitled to relief

in the form of restitution and disgorgement of ill-gotten gain, which should be put in a common fund and distributed to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff and the Class pray for judgment against Defendant as follows:

a. An order certifying this action as a class action under Federal Rule of Civil Procedure 23, defining the Class as requested herein, appointing the undersigned as Class Counsel, and finding that Plaintiff is a proper representative of the Class requested herein;

b. For injunctive and other equitable relief as necessary to protect the interests of Plaintiff and the Class as requested herein;

c. For an award of compensatory, consequential, and general damages, including nominal damages, as allowed by law in an amount to be determined;

d. For an award of restitution or disgorgement, in an amount to be determined;

e. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

f. For prejudgment interest on all amounts awarded; and

g. Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all triable issues.

DATED:  August 21, 2023                Respectfully submitted,

/s/ Kevin C. Hulick
DENNIS R. LANSDOWNE (0026036)
STUART E. SCOTT (0064834)
KEVIN C. HULICK (0093921)
**SPANGENBERG SHIBLEY & LIBER LLP**
1001 Lakeside Avenue East, Suite 1700
Cleveland, OH  44114
(216) 696-3232
(216) 696-3924 (FAX)
*dlansdowne@spanglaw.com*
*sscott@spanglaw.com*
*khulick@spanglaw.com*

Hassan A. Zavareei (*pro hac vice forthcoming*)
**TYCKO & ZAVAREEI LLP**
2000 Pennsylvania Avenue NW, Suite 1010
Washington, DC  20006
(202) 973-0900
(202) 973-0950 (FAX)
*hzavareei@tzlegal.com*

***Counsel for Plaintiff and the Proposed Class***